**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM M. LUDWIG,
              *Plaintiff-Appellant,*

v.

MICHAEL J. ASTRUE,
              *Defendant-Appellee.*

No. 10-35946

D.C. No.
4:10-cv-00002-RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Chief District Judge, Presiding

Argued and Submitted
July 27, 2011—Anchorage, Alaska

Filed June 1, 2012

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Kleinfeld

**COUNSEL**

Paul B. Eaglin, Eaglin Law Office, Fairbanks, Alaska, for the appellant.

Jordan D. Goddard, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Seattle, Washington, for the appellee.

**OPINION**

KLEINFELD, Senior Circuit Judge:

We address whether an administrative law judge's handling of an ex parte contact was error, and if so, whether it was harmless.

## I.    Facts

Ludwig claimed social security disability,[1] his claim was denied, and his appeal to the district court was unsuccessful.

### A.    The Medical Evidence

Ludwig told the Social Security Administration in his May 2006 application that he could not work because of epilepsy, bipolar disease, depression, insomnia, and social anxiety. He had not worked since getting fired at his last job as a cook earlier the same year. He had previously worked on a fishing tender, and as a welder and a cook. In his initial interview, Ludwig attributed his inability to work to his psychiatric problems, not his physical condition. But at his hearing, he claimed disabling arthritis in his knees, hips, and ankles, and degenerative disease in his low back. He testified that he had severe pain if he lifted as much as 15 pounds.

Ludwig had extensive medical records from correctional facilities and community health facilities. He had complained of knee problems for ten years, starting when he was in military service. A year before his social security application, he told a medical provider that he could "press 1,000 pounds," and exercised. His description of his symptoms, together with X-rays and MRIs, led to a diagnosis of chronic pain in both knees and possible tears in the meniscus of the left knee. In 2007, the Department of Veterans Affairs (VA) awarded Ludwig ten percent service-connected disability compensation on account of his knee. Two months before Ludwig's social

---

[1]Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A five-step evaluation process is used to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

security hearing, a VA examining physician described Ludwig's knee problems as "minimal." Around the same time, a chiropractic report said that Ludwig was walking normally.

Ludwig also complained of back pain. On June 14, 2007, Ludwig told a medical provider that he had been experiencing low back pain since trying to pick up a dishwasher the previous month. Two weeks later, he reported to a different examiner that he had endured chronic back pain since straining his back eleven years earlier, but had suffered no recent injury. He was diagnosed with lumbar strain and mild disc herniation. Ludwig said to one medical provider that Vicodin was "the only thing that helped before" with the back pain, but was instead prescribed methadone. The prescription was later changed to morphine sulphate, after Ludwig complained of side effects from the methadone. Physical therapy was prescribed, but Ludwig did not complete the sessions.

Ludwig was diagnosed with bipolar disorder in 2002. Medication successfully controlled it. Ludwig reported to his doctor in early 2006, the same year he applied for social security disability benefits, that, so long as he stayed away from alcohol, his medication kept him reasonably stable. After he got fired from his job as a cook, he enrolled in a drug and alcohol treatment program.

He also had a seizure disorder, controlled by medication. An emergency department record shows that Ludwig was admitted to the emergency room in March 2006, after having had a "witnessed seizure while working at the local Denny's restaurant." He testified at his social security hearing that this was an anxiety attack, not a seizure. But he also testified to far more frequent and recent seizures than what he had told his medical providers.

Ludwig's social security application was denied in July 2006. The Social Security Administration's medical consultant, after reviewing Ludwig's records, concluded that Lud-

wig's mental impairments caused mild restrictions and difficulties. He opined that Ludwig could lift or carry 25 pounds frequently, 50 pounds occasionally, stand or walk for about 6 hours in an 8-hour workday, and sit for the same amount of time. After the initial denial, Ludwig requested a hearing.

At his hearing, Ludwig testified that he could not lift more than 15 pounds without severe pain, and that it was very painful to sit for more than half an hour. But he also testified that he carried his own firewood into his cabin for heat. He testified that his bipolar disorder made it difficult for him to control his anger, and that he became anxious in crowds of more than ten people. He said he had been fired from his job at Denny's because he could not get along with his coworkers. Ludwig claimed that he suffered three or four grand mal seizures a year, the last one about a month before the hearing. He testified that his petit mal seizures occurred too frequently for him to count. But medical records from 2007 show that he claimed there were three to five year periods where he had no seizures.

## B.    Ex Parte Communication

Right after the hearing, and before the ALJ had issued his decision, an FBI agent told the ALJ that Ludwig was apparently faking his physical disability. The ALJ immediately sent a letter to Ludwig's lawyer, disclosing the ex parte contact. The ALJ suggested that counsel could contact the FBI agent if he wished, though he did not represent that the agent had agreed to talk to counsel:

> Shortly after your client's hearing . . . a special agent with the F.B.I. [ ] informed me that, earlier, he had observed Mr. Ludwig in the parking lot walking with normal gait and station; and when he observed Mr. Ludwig walking inside of the Federal Courthouse (where our hearing was held) he was walking with

> an exaggerated limp (which I also observed as he left the hearing room).
>
> Should you wish to inquire further, [the special agent] can be reached at the F.B.I. office at:
>
> 101 12th Ave
> #329
> Fairbanks, AK, 99701

Counsel responded, objecting to any weight being given to what the FBI agent had said.

Counsel asked that unless the ALJ gave assurance that no weight would be given to the ex parte communication, he receive a supplementary hearing at which counsel could cross-examine the agent. Counsel intended to address whether, among other things, the FBI agent really had observed Ludwig as he thought, since around a dozen people had been in and out of the several hearings that morning. He questioned the accuracy of the FBI agent's observations, since Ludwig's knee problem was well-documented in the medical records. Counsel also expected to ask whether his client had been under some sort of surveillance, making him recognizable to the FBI agent.

## C.  The ALJ's Decision

The ALJ found that although Ludwig had a "longstanding seizure disorder," it was "controlled when he takes medication as prescribed." He noted conflicting evidence on Ludwig's physical condition, including Ludwig's claim that he could press 1,000 pounds, the chiropractor's observation that Ludwig walked normally, and evidence of damage to Ludwig's left knee.

The ALJ found that the seizure disorder and diseased tissue in the left knee were "severe" for social security purposes. As

for Ludwig's back pain, the ALJ found that Ludwig's "contradictory accounts" and minimal objective findings established that Ludwig "was exaggerating symptoms." He found that Ludwig's bipolar disorder was "well controlled" so long as Ludwig took his medicine and abstained from alcohol, so it caused only "mild" restriction of activities of daily living and functioning.

The ALJ found that none of Ludwig's impairments, separately or together, met the criteria of a listed impairment,[2] and that Ludwig had the capacity to perform "medium" work.[3] Most importantly, the ALJ found that Ludwig was not credible, and had exaggerated how intense, persistent, and limiting his impairments were.

The decision notes that the FBI agent told the ALJ after the hearing that the agent had seen Ludwig in the parking lot "with a normal gait and station and subsequently observed the claimant walking with an exaggerated limp once inside the Federal Courthouse." The ALJ wrote that he did "not assign significant weight" to the agent's statements because the FBI agent was not familiar with Ludwig's medical history and observed Ludwig "only briefly." The ALJ did not say, as Ludwig's counsel had requested as an alternative to a supplementary hearing, that the ALJ had not assigned "any" weight to what the FBI agent told him, just that whatever weight he gave it was not "significant."

The ALJ explained that the record contained "other evidence showing [Ludwig had] exaggerated symptoms." Ludwig's testimony about his seizures was clearly exaggerated "based on what he told health providers." Ludwig had claimed for compensation purposes in March 2008 that he could walk "no more than a few yards," but had reported a month before to a medical provider that he had walked two

---

[2]*Citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[3]*Citing* 20 C.F.R. §§ 404.1567(c), 416.967(c).

miles in sub-zero temperatures and suffered frostbite. (Ludwig lives in Fairbanks, Alaska.) Ludwig's back and knee claims were inconsistent with his claim to health care providers that he could press 1,000 pounds. He had exaggerated various parts of his medical history to various providers. Likewise, Ludwig contradicted himself in different contexts about his claimed difficulty with social interactions. His statements that he walked for exercise, cut wood for heat, and stood for nine hours a day as a cook, contradicted his claimed physical limitations. The ALJ found that Ludwig could still work as a cook, as he had before he was fired for not getting along, and was not disabled under the Social Security Act. The district court affirmed.

## II.   Analysis

### A.   Standard of Review

We review the district court's decision de novo "to ensure that the [ALJ's] decision was supported by substantial evidence and a correct application of the law."[4] Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and "[e]ven when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."[5]

### B.   The Ex Parte Contact

The ex parte contact in this case is troubling. Judges are supposed to get their evidence from the testimony and exhib-

---

[4]*Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (citation omitted).

[5]*Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012) (citations omitted).

its, not private chats.[6] The judge should have refused to hear the ex parte communication. Ordinarily, if someone says to a judge, "Judge, you know that case you heard this morning?", a judge responds, "Don't tell me anything about it. I can't listen to evidence out of court."

The FBI agent's statements went to the heart of the case. Part of Ludwig's disability claim was his knee problem that he said made it hard to walk. He limped in the courtroom. The FBI agent told the ALJ that he saw Ludwig walking in the parking lot without limping. That is to say, the FBI agent told the ALJ privately that Ludwig was faking.

An FBI agent, by virtue of his employment, is likely to have more credibility with a trier of fact than a felon like Ludwig, with conflicting medical records and a history of substance abuse. To impeach the FBI agent, Ludwig's lawyer wanted to ask the agent in a supplementary hearing, "How do you know the person you saw in the parking lot was Ludwig?" That is a good question, and counsel doubtless had reasons for wanting to ask the FBI agent in front of the ALJ. The FBI agent was under no obligation to talk to Ludwig's attorney, and might have refused to answer his questions without a scheduled hearing. Even if the FBI agent did respond to counsel's inquiries, he would have plenty of time to improve how his answers sounded if he got a private rehearsal with claimant's counsel. Without a hearing, the ALJ would not be able to see the agent's demeanor when answering questions.

**[1]** Ludwig's lawyer asked for either an assurance that the ALJ would give no weight to the ex parte communication, or

---

[6]*See* 42 U.S.C. § 405(b)(1) (providing that if a hearing is held, the Commissioner of Social Security "shall, *on the basis of evidence adduced at the hearing*, affirm, modify, or reverse the Commissioner's findings of fact and [initial disability] decision") (emphasis added); 20 C.F.R. § 404.953(a) (providing that the "administrative law judge must base [its] decision *on the preponderance of the evidence offered at the hearing or otherwise included in the record*") (emphasis added).

else a supplementary hearing to explore what force it should have. He got neither. The ALJ said in his decision that he did not give "significant" weight to the FBI agent's information, not that he disregarded it or gave it no weight. Congress has commanded that the ALJ's decision be "on the basis of evidence adduced at the hearing," not on the basis, even in part, of private chats outside the hearing.[7]

[2] Ludwig cites *Richardson v. Perales*, but that case addresses whether hearsay reports can constitute substantial evidence, not ex parte communications.[8] Ludwig also cites *Guenther v. Commissioner*, which is binding circuit authority and on point. We held, in the first of our two decisions in that case, that " '*ex parte* proceedings are anathema in our system of justice,' " and "absent some 'compelling justification,' *ex parte* communications will not be tolerated."[9] We held that disclosure of the ex parte information after the trial was over denied the other side "a meaningful opportunity to be heard."[10] We remanded for an evidentiary hearing to determine precisely what the contents of the ex parte communication were, why it was made, why it was not served on opposing counsel, and such other facts as might bear on acceptance and consideration of the ex parte communication.[11] When the case came back to us, after the record had been supplemented with findings and the contents of the ex parte communication, we held that the ex parte communication prejudiced the appellants, and denial of a supplementary hearing had denied them an adequate opportunity for rebuttal.[12]

---

[7]42 U.S.C. § 405(b)(1).

[8]*Richardson v. Perales*, 402 U.S. 389, 402 (1971).

[9]*Guenther v. Comm'r*, 889 F.2d 882, 884 (9th Cir. 1989) (quoting *United States v. Thompson*, 827 F.2d 1254, 1258-59 (9th Cir. 1987)).

[10]*Id.*

[11]*Id.* at 885.

[12]*Guenther v. Comm'r*, 939 F.2d 758, 761 (9th Cir. 1991).

We reversed in *Guenther*, requiring that the case be reassigned to a different judge who had not been exposed to the ex parte communication.[13] We admonished that "[w]e trust that we will not again be confronted by an institutionalized due process violation," such as the ex parte communication in that case, which went "both to the merits of the case and to the [appellants'] character generally."[14] Yet today, we are.

This case differs from *Guenther* in that the ALJ here promptly notified Ludwig's attorney of the ex parte communication. Also, the error in *Guenther* was more egregious, in that the ex parte communication was by a party to the proceeding. We are not persuaded that these distinctions make a difference to the question of whether Ludwig was entitled to an evidentiary hearing, though, since the judge in both *Guenther* and this case received an ex parte communication going to the heart of the case, and declined to say that he disregarded it.

By contrast, we affirmed a decision, despite ex parte communication, in *Alexander Shokai, Inc. v. Commissioner*.[15] In *Shokai*, counsel was provided with notice of a hearing addressing a third party motion to quash a subpoena, and elected not to attend.[16] No secret communication was made to the judge, as in *Guenther* or this case. At the hearing in open court, prior to trial, government counsel brought up matters relating to the merits of the case and outside the scope of the notice of hearing.[17] The judge in *Shokai* expressly refused to make any rulings on these matters until opposing counsel could be heard.[18] In *Shokai*, unlike this case, the error was

---

[13]*Id.* at 762.

[14]*Id.* at 761-62.

[15]*Alexander Shokai, Inc. v. Comm'r*, 34 F.3d 1480 (9th Cir. 1994).

[16]*Id.* at 1484.

[17]*Id.*

[18]*Id.*

before trial, and counsel had an adequate opportunity to deal with it at trial, before the judge formed a conclusion.

**[3]** Allowing the FBI agent to speak to the judge outside the presence of counsel, with no opportunity for counsel to cross-examine the agent, and no assurance that the communication had no influence on the result, was error. "Notice and [a meaningful] opportunity to be heard are the hallmarks of procedural due process."[19] Though Ludwig was given notice of the evidence against him, he was not given a meaningful opportunity to be heard on it. The ALJ offered his own impeachment that the FBI agent's observation was brief and that the agent was unfamiliar with Ludwig's medical records. But Ludwig's lawyer might have done better. Where, as here, the communication is ex parte, is not disregarded by the judge, and may be subject to significant factual questions, we cannot see what justification there could be for denying a request for an evidentiary hearing. Receipt of the ex parte communication, assignment of some weight to it, and denial of a supplementary hearing to address it, was error.

## C.  Harmlessness

**[4]** Because the judge erred by considering the ex parte evidence without allowing a supplementary hearing, we are required to evaluate whether there was prejudice. We need not decide whether, in these circumstances, a statement that the judge disregarded the evidence would suffice to establish absence of prejudice, because the ALJ made no such statement. We do not suggest that private chats with witnesses are purged of any taint by a rote recitation that they were given "no" weight. But here we do not have even that assurance. No "significant" weight, perhaps a more candid statement than "no" weight, carries a negative pregnant, that the communication received some weight.

---

[19]*Guenther*, 889 F.2d at 884.

**[5]** *Shinseki v. Sanders* establishes that administrative adjudications are subject to the same harmless error rule as generally applies to civil cases. Reversal on account of error is not automatic, but requires a determination of prejudice.[20] Determination of prejudice requires "case-specific application of judgment, based upon examination of the record," not "mandatory presumptions and rigid rules."[21] The burden is on the party claiming error to demonstrate not only the error, but also that it affected his "substantial rights," which is to say, not merely his procedural rights.[22] Among the case-specific factors an appellate court must consider are "an estimation of the likelihood that the result would have been different,"[23] as well as the impact of the error on the public perception of such proceedings:

> [T]he factors that inform a reviewing court's "harmless-error" determination are various, potentially involving, among other case-specific factors, an estimation of the likelihood that the result would have been different, an awareness of what body (jury, lower court, administrative agency) has the authority to reach that result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circum-

---

[20]*Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). *See Molina v. Astrue*, 674 F.3d 1104, 1118 (9th Cir. 2012); *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

[21]*Sanders*, 556 U.S. at 407.

[22]*Id.* at 407-409. The harmless error rule, as codified, requires us to "give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; *Molina*, 674 F.3d at 1118.

[23]*Sanders*, 556 U.S. at 411.

stances in which the error arises may well make all the difference.[24]

We addressed the issue of harmless error in social security disability cases in *McLeod v. Astrue*, holding that *Sanders* applies fully to them.[25] We held that the claimant need not necessarily show what other evidence might have been obtained had there not been error, but does have to show at least a "substantial likelihood of prejudice."[26] And as *Sanders* required, we held that to evaluate error for harmlessness, "we must exercise judgment in light of the circumstances of the case," as opposed to the sort of presuming and generalizing that *Sanders* rejected.[27]

[6] Having done so, we conclude that there was no prejudice from the error. The contradictions between what Ludwig said when he testified in his disability hearing, and what he had said on other occasions, were dramatic. He had to have spoken falsely for many years to medical personnel for him to be speaking truthfully at his hearing. Considering the record as a whole, and the ALJ's explanation of his decision, we are convinced that Ludwig has not demonstrated that the decision would have been any different without the ex parte communication.

How could the ALJ give some weight to the FBI agent's communication, but not a "significant" enough amount to affect the outcome? Any judge with an adequate amount of humility makes many decisions about which he has varying degrees of confidence in his own judgment. Learning after a firm conviction has been formed that one's conviction is supported by additional evidence can affect the judge's level of confidence in his decision, without affecting the outcome of

---

[24]*Id.* at 411-12.

[25]*McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011).

[26]*Id.* at 888.

[27]*Id.*

the decision. The ALJ's decision, and the record of Ludwig's contradictions, make it plain that the ALJ would have reached the same conclusion—that Ludwig was fit to resume work like his last job as a cook—had the FBI agent not spoken to him about his observations of Ludwig.

[7] An ex parte contact can be quite egregious without being prejudicial.[28] In the absence of actual prejudice from the error, we are required, under *Sanders* and *McLeod*, to conclude that the ex parte communication does not entitle Ludwig to a reversal.[29]

Ludwig makes two other arguments: that consideration of the ex parte evidence denied his right to petition for redress of grievances, and that it violated the ALJ's duty to develop the record.[30] Both arguments appear to be rephrasings of the ex parte evidence argument discussed above. They fail for the same reasons.

AFFIRMED.

---

[28]*See, e.g.*, *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 908 (9th Cir. 2000) (holding that defendants were not prejudiced by a bailiff's inappropriate ex parte contact with juror).

[29]"[W]here harmlessness is clear and not a 'borderline question,' remand for reconsideration is not appropriate." *McLeod*, 640 F.3d at 888 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 413 (2009)).

[30]"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).