PRESENT: All the Justices

COMMONWEALTH OF VIRGINIA,
DIVISION OF RISK MANAGEMENT

OPINION BY
v. Record No. 150930                                  JUSTICE D. ARTHUR KELSEY
                                                      June 23, 2016

VIRGINIA ASSOCIATION OF COUNTIES GROUP
SELF INSURANCE RISK POOL, f/k/a VIRGINIA
ASSOCIATION OF COUNTIES RISK POOL

FROM THE CIRCUIT COURT FOR NEW KENT COUNTY
Thomas B. Hoover, Judge

This appeal involves a dispute between two sources of insurance coverage for claims

asserted by a pretrial detainee against guards and nurses at a regional jail. The circuit court held

that, as a matter of law, one insurance source provided primary coverage and the other offered

only excess coverage. We hold that both provided concurrent primary coverage. We thus

reverse and remand for the circuit court to determine the proper contributions of each to the costs

of defense and indemnification associated with settlement of the underlying liability suit.

I.

A. TWO INSURANCE SOURCES

The Northwestern Regional Jail Authority operates the Northwestern Regional Adult

Detention Center. During the relevant time frame, the jail authority purchased a general liability

insurance policy ("VaCorp Policy") from the Virginia Association of Counties Group Self

Insurance Risk Pool ("Risk Pool Association"). See generally Code §§ 15.2-2700 to -2709

(authorizing local government group self-insurance pools). The VaCorp Policy stated that the

"coverage afforded by this Contract is primary coverage," J.A. at 141, with a $5,000,000 limit on

liability. The Risk Pool Association also offered excess liability coverage, but the jail authority

declined to purchase it. Id. at 155, 174-75, 180.

The jail authority also elected to participate in a government-sponsored insurance program, the VaRISK Plan, managed by the Division of Risk Management ("DRM"), a division of the Virginia Department of the Treasury. See Code § 2.2-1839. The VaRISK Plan capped its coverage liability at $1,000,000. In the event that a claim against an insured jail defendant involved medical malpractice by a "healthcare provider," as defined by Code § 8.01-581.1, the VaRISK Plan expanded its coverage limit to the applicable medical malpractice cap imposed by Code § 8.01-581.15, which at all relevant times was $2,000,000. J.A. at 145.[1]

Both the VaCorp Policy and the VaRISK Plan addressed the possibility of multiple sources of applicable insurance. The VaCorp Policy included an other-coverage clause stating that the policy provided "primary coverage" except when another clause stated otherwise. Id. at 141.[2] "When this coverage is primary and the Participant has other coverage, which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Fund's liability shall *not* be reduced by the existence of such other coverage." Id. (emphasis added and clerical error omitted). The clause went on to apply a liability contribution formula in the event of concurrent coverage. Id. at 141-42.

The VaRISK Plan included a very different other-coverage clause. In pertinent part, that clause provided, "if, at that time of loss, there is any other coverage or insurance available to a Covered Party which covers such loss or which could have covered such loss, VaRISK *shall not*

---

[1] Code § 8.01-581.15 sets staggered statutory limitations on recovery for verdicts "against a health care provider in an action for malpractice." The purpose of the cap, which was $1.5 million at the statute's enactment but will be $2.95 million by July 1, 2030, "is to provide a 'security blanket' to health care providers and their insurers, to know what limits in coverage should be carried and to keep insurance available and affordable." Simpson v. Roberts, 287 Va. 34, 41, 752 S.E.2d 801, 804 (2014).

[2] The VaCorp Policy contained sections addressing "Property," "General Liability," "Auto," "Crime," and "Public Officials Liability" coverage. J.A. at 51. The "Public Officials Liability" section of the policy included an other-coverage clause, but that does not apply here because such coverage was not purchased by the jail. Id. at 109, 134.

2

*have any liability* for such loss." Id. at 150 (emphasis added). The forfeiture of coverage, however, did not apply in two situations:

> This condition shall not apply if the Director of DRM approves in writing, in advance, of the issuance of such other coverage or insurance designating the Plan as primary. Further, this condition will not apply unless the Director of DRM gives written authorization for the Plan to provide the underlying coverage for any excess or umbrella coverage purchased by a Constitutional Officer or Regional Jail Authority that has paid a contribution to the Plan for this primary coverage and that otherwise meets the terms and conditions for VaRISK primary endorsement.

Id. at 150-51.

Both the Risk Pool Association and DRM issued what they considered to be primary coverages to the jail authority. Id. at 141, 159, 280, 285, 451. Neither described their coverage as excess, rather than primary.[3] The jail authority, as the insured, had the same understanding. See id. at 402 (circuit court's final order noting that "both coverages have been contracted for by [the jail authority] for primary coverage").[4]

## B. THE UNDERLYING LAWSUIT

In 2013, a pretrial detainee in the custody of the jail filed a federal suit under 42 U.S.C. § 1983 against several guards and nurses who worked for the jail authority, claiming that they were deliberately indifferent to his serious medical needs. See Boren v. Northwestern Reg'l Jail

---

[3] See J.A. at 280 (DRM's admission that the "VaRISK Plan is not intended to function as excess coverage"); id. at 141 (VaCorp policy provision stating that "[t]he coverage afforded by this Contract is primary coverage, except when stated to apply in excess of or contingent upon the absence of other coverage"); see also id. at 174-75 (the Risk Pool Association's admission in pre-trial briefing that "although [it] could have issued *excess* insurance to NRJA . . . , the [jail authority] never contracted for such coverage" (emphasis added)).

[4] See also id. at 180 (jail authority's assertion in pre-trial briefing that VaCorp's general liability policy applied to the tort claims); id. at 285 (DRM's admission that the jail authority had "paid a contribution to the Plan for primary coverage and otherwise meets the terms and conditions for VaRISK primary coverage").

3

Auth., No. 5:13-cv-00013, 2013 U.S. Dist. LEXIS 140169 (W.D. Va. Sept. 30, 2013).[5] The detainee's complaint also asserted state law claims alleging medical malpractice, negligence, and a due process violation under the Constitution of Virginia.

The detainee alleged that he had been placed in the jail on a charge of public intoxication. While there, he allegedly suffered from seizures resulting from alcohol withdrawal. The detainee claimed that the jail nurses and guards were deliberately indifferent to his need for prompt medical care, causing him to suffer multiple untreated seizures due to "severe metabolic acidosis." J.A. at 19. He alleged that these seizures left him permanently disabled.

While the federal suit was pending, the detainee filed a declaratory judgment action in circuit court against DRM and the Risk Pool Association, seeking a determination of their respective liabilities for insuring the jail defendants. The Risk Pool Association filed a third-party claim against DRM, seeking a declaration that, pursuant to Code § 2.2-1839, the VaCorp Policy only provided, at most, excess coverage for the underlying suit. Id. at 225-26. DRM filed a corresponding claim against the Risk Pool Association, contending that the VaCorp policy provided primary insurance coverage, making the VaRISK Plan an excess policy pursuant to an other-coverage provision in the VaRISK Plan. Id. at 231-33.

While both the federal and state proceedings were pending, the detainee entered into a settlement with the jail defendants for an undisclosed amount. DRM and the Risk Pool Association agreed to fund the settlement contingent upon the final judicial resolution of their respective liabilities. In the proceeding for declaratory judgment, the circuit court dismissed the detainee and jail defendants based upon their settlement, leaving only DRM and the Risk Pool

_____

[5] Because of his incapacitation, the detainee's suit was filed by his guardian and the conservator of his estate. Id. at 10, 12.

4

Association's opposing claims for declaratory relief. Id. at 398-99. Both filed motions for summary judgment based upon undisputed facts.

DRM argued that the VaCorp policy provided sole primary coverage for the detainee's claims in the federal suit and that the VaRISK Plan's other-coverage clause extinguished any DRM liability as a matter of law. DRM also contended that its $1,000,000 policy limit, not the expanded $2,000,000 limit applicable to medical malpractice claims, should cap any coverage liability that the VaRISK Plan might otherwise have with respect to the detainee's civil rights claims. In response, the Risk Pool Association claimed that the VaRISK Plan was the sole primary policy as a matter of law and that the VaCorp policy provided, at best, excess coverage.

The circuit court found that "both coverages have been contracted for by [the jail authority] for primary coverage." Id. at 402.[6] However, the court interpreted Code § 2.2-1839 to preclude DRM's VaRISK Plan from being anything other than the *sole source* of primary coverage. From this premise, the court reasoned that the jail authority "was permitted only to secure excess liability coverage beyond the primary coverage provided by DRM." Id. After finding the VaRISK Plan to be the sole primary coverage, the court concluded that DRM had the exclusive duty to defend the jail defendants.

In addition, the circuit court found that the VaRISK Plan's $2,000,000 coverage extension for medical malpractice claims applied to all of the detainee's claims (whether based

---

[6] The Risk Pool Association asserted two assignments of cross-error challenging the circuit court's determination that the VaCorp Policy covered the claims asserted by the pretrial detainee in the federal suit. We refused to grant a writ of error on those assignments, and thus, the circuit court's holding on that issue has become the law of the case. See Sheets v. Castle, 263 Va. 407, 411, 559 S.E.2d 616, 619 (2002). Accord Carter v. Hough, Gray & Co., 89 Va. 503, 505, 16 S.E. 665, 665 (1892); Martin P. Burks, Common Law and Statutory Pleading and Practice § 431, at 850 (T. Munford Boyd ed., 4th ed. 1952) ("The decision of the appellate court, right or wrong, is final after the rehearing period has passed. . . . From this naturally follows the rule commonly called 'the law of the case.'").

on state tort law, federal § 1983 law, or state constitutional law) against "the named defendant healthcare providers," i.e., the jail nurses. See id. Turning to the VaCorp Policy, the court held that it would be converted by operation of law into an excess policy. In that capacity, the court further concluded, the Risk Pool Association had no duty to contribute toward the defense costs incurred by the jail defendants in the federal suit.

## II.

DRM argues on appeal that the circuit court misinterpreted Code § 2.2-1839 to mandate that the VaRISK Plan be treated as the *sole source* of primary coverage and, working from this faulty premise, erroneously declared void the other-coverage clause in the VaRISK Plan.[7] DRM also contends that the court erred in applying to the detainee's federal § 1983 claim the $2,000,000 extended coverage cap applicable only to medical malpractice claims.

### A. THE VARISK PLAN

Code § 2.2-1839(A) directs DRM to "establish one or more risk management plans" for qualified participants, such as, for example, state officers and agencies, constitutional officers, political subdivisions, jail authorities, and certain individuals serving the public interest. The DRM plans, if approved by the Governor, may include "purchased insurance, self-insurance or a combination of self-insurance and purchased insurance." Code § 2.2-1839(A).

DRM proposed, and the Governor approved, the Constitutional Officer and Regional Jail Risk Management Plan, known simply as the VaRISK Plan.[8] The VaRISK Plan provided

---

[7] These arguments correspond to assignments of error 1 and 2. See Appellant's Br. at 8. Our resolution of these two assignments also addresses DRM's assignments of error 3 and 4. See id. (contesting the circuit court's conversion of the VaCorp Policy to excess coverage as a matter of law and interpretation of the statute to require DRM to pay the costs of a plan participant's defense, even though other primary coverage existed).

[8] The VaRISK 2 Plan serves as a comprehensive, liability, self-insurance plan applicable to cities, towns, counties, public schools, districts, commissions, boards, authorities, and other

6

primary liability coverage for plan participants, unless DRM specifically agreed to extend only excess liability coverage to a particular plan participant. The statute makes clear that "[p]articipation in the risk management plan shall be voluntary," Code § 2.2-1839(C), and that nothing in the statute precludes a plan participant from obtaining any additional insurance from any other source.

The circuit court held that the statute forbids a VaRISK plan participant from purchasing additional primary coverage from another source. The court apparently drew that inference from Code § 2.2-1839(G), which grants sheriffs' departments and regional jail authorities the right to purchase "excess liability coverage" beyond the primary coverage afforded under the VaRISK Plan. The negative inference, the court reasoned, was that no VaRISK participant (including sheriffs and regional jail authorities) could secure additional *primary* coverage absent DRM's permission.

The circuit court read too much into subsection G. The General Assembly added subsection G to Code § 2.2-1839 in 2007, see 2007 Acts ch. 773, shortly after DRM issued the VaRISK Plan, see J.A. at 152 (showing the Governor's approval in 2005). The VaRISK Plan required plan participants to obtain permission from DRM before purchasing an excess policy. The evident purpose of subsection G was to preclude DRM from withholding that permission when a sheriff's department or regional jail authority sought to secure excess coverage.

In this case, however, the jail authority did not purchase an excess coverage policy from another source of insurance. It purchased a *primary* coverage policy — the VaCorp Policy issued by the Risk Pool Association. Nothing in Code § 2.2-1839's voluntary statutory scheme

---

specified organizations. See, e.g., School Bd. of Newport News v. Commonwealth, 279 Va. 460, 463, 689 S.E.2d 731, 732-33 (2010). This case, as well as our discussion addressing it, involves only the VaRISK Plan applicable to constitutional officers and regional jail authorities.

7

forbids, explicitly or implicitly, plan participants from securing additional primary coverage. Nor do any of the regional jail authority's enabling statutes suggest as much. See Code § 53.1-95.7(4) (authorizing regional jail authorities to enter into contracts "upon such terms and for such purposes as they deem advisable").

Our common-law tradition counsels that courts "are not lightly to interfere" with lawful exercises of the "freedom of contract." Atlantic Greyhound Lines v. Skinner, 172 Va. 428, 439, 2 S.E.2d 441, 446 (1939) (citation omitted); accord 7 Steven Plitt et al., Couch on Insurance 3d, § 98:6, at 98-16 to -17 (rev. ed. 2013) (stating the general rule that insurers and insureds are "free to contract on the basis of an 'other insurance' clause" and collecting cases affirming this rule).[9] Given the absence of any clearly expressed legislative prohibition, we conclude the circuit court erred in holding that the jail authority was statutorily prohibited from securing primary coverage in addition to participating in the VaRISK Plan.

## B. THE OTHER-COVERAGE CLAUSES

Because the jail authority secured two primary sources of coverage, the VaCorp Policy and the VaRISK Plan, we must referee between their competing other-coverage clauses.

The VaCorp Policy included an other-coverage clause that secured its primary position even in the event that other insurance sources were concurrently applicable. See J.A. at 141. "When this coverage is primary," the clause provided, "and the Participant has other coverage, which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Fund's liability . . . shall *not* be reduced by the existence of such other coverage." Id. (emphasis

---

[9] See Roscoe Pound, Liberty of Contract, 18 Yale L.J. 454, 459-61 (1909) (commenting that, as derived from our natural-law tradition, "our courts regard the right to contract, not as a phase of liberty — a sort of freedom of mental motion and locomotion — but as a phase of property," and thus a person's "right to contract freely is to yield only to the safety, health, or moral welfare of the public").

added and clerical punctuation error omitted). In circumstances where "both this coverage and other coverage apply to the loss on the same basis, whether primary, excess or contingent," the other-coverage clause employed a liability "contribution" formula to determine the specific liability of the concurrent coverages. Id. at 141-42.

The VaRISK Plan's other-coverage clause, on the other hand, stated, "if, at that time of loss, there is *any other coverage* or insurance available to a Covered Party which covers such loss or which could have covered such loss, VaRISK *shall not have any liability* for such loss." Id. at 150 (emphasis added). The circuit court deemed this clause unenforceable because Code § 2.2-1839, under the court's view, precluded any other insurance (such as the VaCorp Policy) from displacing the VaRISK Plan's primary coverage position. As we noted earlier, this holding swept too broadly.[10] Even so, we disagree with DRM's view that the VaRISK Plan's other-coverage clause converted the VaRISK Plan into excess coverage as a result of the jail authority's purchase of the VaCorp Policy.

The original purpose of other-coverage clauses in insurance policies appears to have been to cut off duplicative recoveries against different insurers, perhaps unaware of each other, for exactly the same loss. See generally 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 219:1, at 219-7 (2005). There are three basic types of such clauses. Id. § 219:5, at 219-12. One category permits concurrent coverage subject to pro-rata-contribution formulas, in a similar manner as the VaCorp Policy. See id. § 219:27, at 219-32; 2 Allan D. Windt, Insurance Claims and Disputes § 7:1, at 7-2 (6th ed. 2013).[11] A second type of clause "purports to make an

_____

[10] We acknowledge, but find unpersuasive, the Risk Pool Association's reliance on Bryant v. State Farm Mutual Automobile Insurance, 205 Va. 897, 140 S.E.2d 817 (1965), and Nationwide Mutual Insurance v. Hill, 247 Va. 78, 439 S.E.2d 335 (1994), both of which involve the unique statutory requirements applicable to uninsured and underinsured motorist coverage.

[11] See Russ & Segalla, supra, § 219:28, at 219-33 ("If the insured has other similar

9

otherwise primary policy excess insurance should another primary policy cover the loss in question." Russ & Segalla, supra, § 219:33, at 219-36. The third category seeks to absolve the insurer of any and all liability — co-primary or excess — in the event that the insured obtains duplicative coverage elsewhere. See id. § 219:36, at 219-42; 2 Windt, supra, § 7:1, at 7-2.

Often called "escape" clauses, this third type of other-coverage clause has spawned a great deal of litigation and has been met with a considerable amount of judicial hostility, particularly when competing coverages attempt to cancel each other out. See 22 Allison E. Butler, Appleman on Insurance Law & Practice Archive § 140.2[C] (2016) (noting that "absolute escape clause[s]" are "often disfavored by the courts" because "the insured pays premiums for coverage" that he would not receive); Russ & Segalla, supra, § 219:37, at 219-44 to -45 (characterizing "escape clauses [as] disfavored" and in some cases "unenforceable, where . . . enforcement of the clause would result in the insured losing all coverage"); see generally 2 Windt, supra, § 7:1, at 7-6 to -10 (discussing different approaches to reconciling "excess-escape clause combinations"). We have never addressed whether such escape clauses can result in a total forfeiture of coverage, and we see no need to do so in this case.

As we observed earlier, DRM is not a private insurance company. It is a division of the Virginia Department of the Treasury. See Code § 2.2-1839. In Code § 2.2-1839, the General Assembly tasked DRM with developing a voluntary and affordable alternative to market-based insurance policies for various state and local government entities (as well as specific private individuals and entities) seeking to limit their potential liability. It seems quite unlikely to us

_____

insurance available to him the Company shall not be liable for a greater proportion of any loss to which this Coverage applies than the limits of liability hereunder bear to the sum of the applicable limits of liability of this insurance and any such other insurance." (alterations omitted)); id. at 219-33 to -34 (setting forth more complex pro-rata formulas and collecting cases involving the same).

10

that the General Assembly intended DRM's insurance obligations to evaporate merely because a plan participant exercised its right to secure additional primary coverage elsewhere.

We need not examine this hypothesis in any detail, however, because DRM does not advocate for it. DRM does not contend on appeal that its other-coverage provision triggered a total forfeiture of coverage. Appellant's Br. at 22 ("DRM is not attempting to escape its coverage obligations, but is attempting to order competing coverage obligations to best preserve state funds."); see also J.A. at 423 (DRM counsel's disavowal of the "none at all" interpretation); id. at 475 (DRM's affirmation that it has not "invoked" the other-coverage clause to say "we don't owe a penny in this case").

Instead, DRM contends that its other-coverage clause merely converted the VaRISK Plan into excess coverage that would be effective only after the sole primary coverage, the VaCorp Policy, had been exhausted. See Appellant's Br. at 22-28; Oral Argument Audio at 2:07 to 2:17 (contending that DRM is simply "last in line" to pay any coverage). Interpreting its other-coverage clause this way, DRM concedes, "does not excuse DRM's duty to provide coverage, but merely states that it is a source of coverage of last resort when all other coverage sources are exhausted." Id. at 25. Like many other courts,[12] we have approved other-coverage clauses that

---

[12] See, e.g., Aetna Cas. & Sur. Co. v. CNA Ins., 606 A.2d 990, 993-94 (Conn. 1992) (noting that "[p]ublic policy is not violated when 'other insurance' clauses are used for the purpose of establishing the order of payment between insurers" so long as "the insured is afforded full indemnification for a loss"); Unigard Ins. Grp. v. Royal Globe Ins., 594 P.2d 633, 637-38 (Idaho 1979) (finding competing "other insurance" clauses not mutually repugnant and concluding that "by express language of the three policies," two "provided primary insurance coverage and the [third] provided excess coverage"); Nationwide Ins. v. Horace Mann Ins., 759 A.2d 9, 13-14 (Pa. Super. Ct. 2000) (holding that one policy's coverage is excess and another policy's coverage is primary and not excess when interpretation of the "other coverage" clauses is not ambiguous and the clauses do not conflict); Fireman's Fund Ins. v. CNA Ins., 862 A.2d 251, 260 (Vt. 2004) (same).

11

prioritize coverage in this manner.  See State Farm Mut. Auto. Ins. v. United Servs. Auto. Ass'n, 211 Va. 133, 136-38, 176 S.E.2d 327, 330-31 (1970).[13]

Our problem with DRM's argument is more basic:  The VaRISK Plan's other-insurance clause never mentions the possibility of shifting primary coverage to a mere excess liability position.  Instead, its literal terms are absolute.  If "there is *any* other coverage or insurance" applicable, "VaRISK *shall not have any liability* for such loss."  J.A. at 150 (emphases added).  If there were any doubt regarding the VaRISK Plan's intended limitation of its coverage, the policy clarifies that "other coverage or insurance" includes, but is not limited to,

> bonds of any description, policies of insurance or programs of self-insurance purchased or established by or on behalf of a Covered Party to insure against liability arising from the activities of such persons, *regardless of whether or not the policy or program provides primary, excess, excess over excess, umbrella, or contingent coverage* and regardless of the deductible of any other insurance or self-insured retention plan.

Id. (emphasis added).

This wording can only be interpreted as an escape clause, not an excess clause.  See Butler, supra, § 140.2 (providing an example escape clause stating that "[t]he insurance . . . shall not apply to any liability or loss against which the insured has other collectible insurance applicable thereto in whole or in part"); Russ & Segalla, supra, § 219:36, at 219-43 (setting forth a sample "super escape clause" as one "stat[ing] that the insurance will not apply to any liability for a loss that is covered on a primary, contributory, excess, or any other basis by insurance in another insurance company"); cf. State Farm Mut. Auto. Ins., 211 Va. at 137, 176 S.E.2d at 331

---

[13] In State Farm Mutual Automobile Insurance, the other-coverage clause stated that "the insurance hereunder shall apply only as excess insurance over any other similar insurance available to such insured and applicable to such automobile as primary insurance."  211 Va. at 135, 176 S.E.2d 329.  The clause did not seek to "escape all or a portion of its liability to the insured, thus depriving the insured of coverage to which he was legally entitled."  Id. at 137, 176 S.E.2d at 331.

(noting that the "other coverage" clause at issue was distinguishable from that analyzed in

Bryant, because the language of the Bryant policy "permit[ted] [the] insurance company to

*escape all or a portion of its liability* to the insured" (emphasis added)).

We thus leave the words of the VaRISK Plan's other-coverage clause as we found them.

Read literally, they extinguish coverage altogether when other insurance is applicable.  Though

DRM disclaims this interpretation, the alternative interpretation offered by DRM cannot be

harmonized with the plain meaning of the clause.  See generally School Bd. of Newport News v.

Commonwealth, 279 Va. 460, 467-68, 689 S.E.2d 731, 735 (2010) (applying "[f]amiliar

principles" governing the "interpretation of a contract" to DRM's VaRISK 2 Plan).  Nothing in

the other-coverage clause gives the VaRISK Plan, in the event of other applicable insurance, the

ability to abandon its primary coverage status and to retreat to the position of excess coverage.

Our reasoning leads to two conclusions:  (i) The VaRISK Plan's other-coverage clause

does not, as DRM contends, operate as an excess clause, and (ii) DRM does not contend it

operates as an escape clause.  The debate over the other-coverage clause in the VaRISK Plan

thus collapses under its own weight.  The VaRISK Plan provided primary coverage, and no

argument presented to us concerning the Plan's other-coverage clause changes that fact.

For these reasons, we hold that the VaCorp Policy and the VaRISK Plan provided

concurrent primary coverage.  Each had an independent duty to defend and to indemnify its

insured jail defendants.[14]  The circuit court's contrary holding did not require it to determine

---

[14] It necessarily follows that we disagree with the circuit court's holding that DRM had the *exclusive* statutory duty to pay the entire costs of defense.  When two primary insurers have concurrent duties to defend, the costs of that defense are usually apportioned equitably between them.  See 1 Windt, supra, § 4:10, at 4-131 (noting that "when insurance companies at the same level provide coverage for different aspects of the lawsuit against the insured and the defense can be reasonably allocated along those lines, the costs of the defense should be so apportioned between the companies" and citing cases applying this rule); id. § 4:10A, at 4-134 (stating that

13

whether and, if so, how to apportion their respective contributions toward the costs of defense and the settlement proceeds paid to the pretrial detainee. We will not do so in the first instance on appeal.

On remand, we direct the circuit court to resolve any contest between the parties over the appropriate pro-rata allocation of costs of defense and indemnity payments, taking into account any applicable contribution agreement entered into between them. See generally Ohio Cas. Ins. v. State Farm Fire & Cas., 262 Va. 238, 241-42, 546 S.E.2d 421, 423 (2001) (recognizing "equitable contribution" between insurers when "the policies in question . . . afford coverage for the same insureds, and the same risk"); 2 Windt, supra, § 7:4, at 7-35 to -43 (addressing "proration" between insurers providing "indemnity coverage at the same level").[15]

## C. MEDICAL MALPRACTICE COVERAGE

On appeal, DRM also challenges the circuit court's holding that the medical malpractice coverage limit of $2,000,000 applied to all "claims asserted against the named defendant healthcare providers in the Underlying Suit, including the claims alleging violations of 42 U.S.C. § 1983 for deprivation of appropriate medical care." J.A. at 403.[16]

The pretrial detainee's complaint in the federal lawsuit advanced several counts against the jail's nurse defendants. Count II asserted medical negligence solely against the nurses. See

_____

"[w]hen an insured is owed a complete defense by two or more different insurers, each insurer should be willing, if necessary, to pay for all of the defense costs" and then "to advance a claim for contribution against the other insurers" (footnote omitted)).

[15] The record in this case does not contain the funding agreement between the parties regarding the underlying litigation. We thus decline to address the nature and measure of this apportionment, whether DRM's alleged failure to tender the defense has any impact on these issues, see Appellee's Br. at 5; J.A. at 285, or whether the parties' funding agreement addresses the specific method and scope of apportionment of defense and indemnity payments, see Reply Br. at 2-3. The circuit court on remand should address these issues in the first instance.

[16] This argument corresponds to assignment of error 5. See Appellant's Br. at 9.

14

id. at 24-26. Count III, however, claimed that both jail guards and nurses had deprived the detainee of his federal civil rights in violation of 42 U.S.C. § 1983. See id. at 26-28. DRM contends on appeal that its $2,000,000 expanded coverage applied only to Count II (the medical malpractice claim) and not Count III (the federal civil rights claim). We agree.

The VaRISK Plan established a maximum coverage limit of $1,000,000. However, "[f]or a claim against a health provider as defined in § 8.01-581.1 of the Code, the amount recoverable involving an act or acts of medical malpractice shall be limited to the amount provided in § 8.01-581.15 of the Code." Id. at 145. The expanded coverage thus applies only to a "health care provider" claimed to have committed medical "malpractice," as those terms are used in the Medical Malpractice Act, Code §§ 8.01-581.1 to -581.12:2.

The pretrial detainee's complaint carefully distinguished between his claim for medical malpractice under state tort law (Count II) and his claims for civil rights violations under federal constitutional law (Count III). To equate the two for the purpose of applying the medical-malpractice coverage limit requires a similitude too attenuated for us to accept.

The United States Supreme Court held in Estelle v. Gamble, 429 U.S. 97, 104 (1976), that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment. It is true that this type of civil rights claim involves some aspects of the inmate's medical condition, as do medical malpractice claims under state tort law. The analogy begins and ends there, however. Estelle "carefully distinguished between a claim for 'deliberate indifference' and a claim for medical malpractice." Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986). Estelle claims can be asserted, as they were here, against medical providers and non-medical providers. They are not limited to, or calibrated in their application against, only those in the jail who provide health care.

15

The standards of liability are also dissimilar. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A § 1983 claim turns on proof of deliberate indifference, and thus, the relevant question does "not demand that the jury consider probing, complex questions concerning medical diagnosis and judgment. The test for deliberate indifference is not as involved as that for medical malpractice, an objective inquiry that delves into reasonable standards of medical care." Ledford v. Sullivan, 105 F.3d 354, 359 (7th Cir. 1997); see also Farmer v. Brennan, 511 U.S. 825, 838-42 (1994) (observing that "deliberate indifference" is, at least in part, a "*subjective*" standard (emphasis added)).[17]

The analogy breaks down even more clearly when pressed to its logical conclusion. Suppose the detainee had filed Count II (medical malpractice under state tort law) and Count III (federal civil rights claims under § 1983) against the jail defendants in state court rather than federal court. Would the jail defendants be able to limit any recovery under the federal § 1983 claim to the maximum allowed under the Medical Malpractice Act applicable to state torts?

Clearly not. The statutory cap on damages applies only to *state* tort or contract claims alleging medical malpractice, not *federal* civil rights claims alleging constitutional violations. See Code § 8.01-581.15 (limiting scope of statutory caps to "any verdict returned against a

---

[17] Accord Petties v. Carter, 795 F.3d 688, 691-92 (7th Cir. 2015) (noting that "[e]ven admitted medical malpractice is not sufficient to show that a doctor acted with deliberate indifference"); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004) (contrasting deliberate indifference, "a high legal standard," with "medical malpractice or negligence," which is "insufficient to establish a constitutional deprivation under the Eighth Amendment"); Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (noting that "'mere medical malpractice' is not tantamount to deliberate indifference, [although] certain instances of medical malpractice may rise to the level of deliberate indifference" (citation omitted)); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (affirming grant of summary judgment for defendant because "[plaintiff's] allegation that his medical care was inadequate would, at most, constitute a claim of medical malpractice," and plaintiff had "allege[d] no exceptional circumstances which meet the standard of deliberate indifference to serious medical needs required for § 1983 liability").

health care provider in an action for malpractice"); Code § 8.01-581.1 (defining "malpractice" as "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient"); see also Gibson v. Moskowitz, 523 F.3d 657, 667-68 (6th Cir. 2008) (applying state law cap on non-economic damages for medical malpractice claims to plaintiff's medical malpractice claim but not to a § 1983 claim alleging an Eighth Amendment violation).[18]

Consequently, the federal § 1983 claim cannot be equated with medical malpractice principles governed by state tort law.  Nor is it sufficiently analogous to be treated as such for purposes of the VaRISK Plan's $2,000,000 coverage extension for medical malpractice claims.[19] The circuit court, therefore, erred to the extent that it concluded otherwise.

III.

In sum, we hold that the VaCorp Policy and VaRISK Plan provided co-primary liability coverage to the regional jail defendants.  We also conclude that the VaRISK Plan's $2,000,000 coverage extension applicable to medical malpractice claims did not apply to Count III's § 1983 civil rights claim alleging violations of federal constitutional law.  We thus reverse in part and

_____

[18] Accord Bell v. City of Milwaukee, 746 F.2d 1205, 1251 (7th Cir. 1984) ("[I]t would be inconsistent with federal policy to limit the amount of damages awarded to [appellant's] estate solely on the basis of the Wisconsin $25,000 tort law limitation."), overruled on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir. 2005); Rogers v. Saylor, 760 P.2d 232, 238-39 (Or. 1988) ("A state cannot limit the amount a plaintiff can recover in a section 1983 action, just as it cannot require that the plaintiff first submit his claims to the government."); L.A. Ray Realty v. Town Council, 698 A.2d 202, 214 (R.I. 1997) ("[A] state limitation on the availability of prejudgment interest may not be applied if such a limitation would contravene the goal of § 1983 to fully compensate the injured party."); Thompson v. Village of Hales Corners, 340 N.W.2d 704, 711 (Wis. 1983) (holding that municipal liability limitation "has no application to a damage award under 42 U.S.C. [§] 1983").

[19] Count IV of the complaint attempted to state a claim under due process principles protected by the Constitution of Virginia.  No Virginia court has ever recognized a constitutional cause of action under due process principles that approximates the Estelle claim under § 1983 jurisprudence.  The circuit court did not specifically rule on this point, and the parties do not address it on appeal.  We offer no opinion on the subject.

17

affirm in part the circuit court's final order.  We remand this case for the court to determine, in the first instance, the appropriate pro-rata contributions of the VaCorp Policy and the VaRISK Plan toward their joint obligations of indemnity and defense.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>

18